407 So.2d 1270 (1981)
Richard B. SPANGENBERG, Robert W. Merrick, and Boh Bros. Construction Co., Inc., a Joint Venture, d/b/a Industrial Property Development Company
v.
YALE MATERIALS HANDLING-LOUISIANA, INC.
No. 12140.
Court of Appeal of Louisiana, Fourth Circuit.
December 8, 1981.
Rehearing Denied January 21, 1982.
*1271 Reuter & Reuter, Arthur C. Reuter, New Orleans, for plaintiffs-appellees.
Sessions, Fishman, Rosenson, Boisfontaine & Nathan, Robert E. Barkley, Jr., New Orleans, for defendant-appellant.
Before SAMUEL, BOUTALL and CHEHARDY, JJ.
CHEHARDY, Judge.
Defendant, Yale Materials Handling-Louisiana, Inc. (Yale), appeals a district court decision in favor of plaintiffs, Richard B. Spangenberg, Robert W. Merrick and Boh Bros. Construction Co., Inc. (a joint venture, doing business as Industrial Property Development Co. [IPD]), and against the defendant in the amount of $84,958 with legal interest due from January 30, 1979. The judgment also noted that it was subject to a credit in favor of defendant, as per joint stipulation of counsel, of $22,296.59.
The defendant has also appealed a trial court decision denying its motion to recuse the district court judge who rendered the decision in the present case.
The issue of this case is the interpretation of a paragraph in a five-year contract of lease (with an option of renewal for another five years) executed between the plaintiffs and defendant, which states:
"24. Improvements by Landlord:
"Prior to the commencement of the term of this lease, Landlord shall at its own expense complete construction, to Tenant's satisfaction, of the improvements on the Premises as shown in Exhibits `A', `B' and `C', attached hereto and made part hereof. In the event that Tenant requests Landlord to make any changes or additions to the improvements delineated on Exhibits `A', `B' and `C' which would result in increased cost, Tenant may pay such increased cost to the Landlord in cash upon completion of said improvements, or in lieu of a cash payment, Tenant may, at its option, choose to pay as additional rent during each year of the term and the extended term, if this lease is extended by Tenant, an amount equal to 17.22% of the actual cost increase to Landlord resulting from Tenant's changes or additions."
The lease between the parties was signed August 9, 1978 and went into effect on December 1, 1978.
In his written reasons for judgment the district court judge stated:
"On August 9, 1978, plaintiffs and defendant entered into a written lease for the rental of certain warehouse space owned by plaintiffs located at 5800 Jefferson Highway and known as Brookhollow Distribution Center. The lease was for a term of five (5) years, with an option to renew for an additional five years. Attached to the lease were drawings identified therein as Exhibits `A', `B' and `C', which indicated improvements which plaintiffs had agreed to make upon the premises.

* * * * * *
"Subsequent to the signing of the lease, defendant requested what it termed `additional improvements', i.e., additions to those delineated in Exhibits `A', `B' and `C'. The cost of these improvements was $84,958.00, and defendant invoked the above-quoted lease clause, electing to pay 17.22% of the cost over the five-year term of the lease. Plaintiffs informed defendant that the improvements could not be funded pursuant to paragraph 24 of the lease agreement, *1272 because the improvements were not additions to those contemplated by the parties and delineated in Exhibits `A', `B' and `C', but rather were completely new and different `special purpose' improvements. Therefore, subsequently, defendant, thinking that plaintiffs would pay for same, ordered the additional improvements directly through Broadmoor Corporation, the contractor who constructed the improvements. After the completion of the improvements, plaintiffs were informed by defendant that defendant was not going to pay Broadmoor for the improvements, but rather was going to pay plaintiffs via an increased monthly rental as stipulated in paragraph 24 of the lease. Plaintiffs were therefore required to pay, under protest, the entire bill due Broadmoor in cash.
"Plaintiffs now institute this action to recover the cost of the `special purpose' improvements, $84,958.00. At issue is the interpretation of paragraph 24 of the lease agreement, i.e., whether or not the improvements are those contemplated as `additional' improvements under the terms of the lease.
"Normally, the contract, or in this case, lease, constitutes the law between the parties and courts are obliged to enforce the contract as written. * * * However, the fact that a real controversy exists between the parties intentions is a valid basis for the consideration of parol evidence. * * * It is abundantly clear that a `real controversy' does exist between the parties in the case at bar; indeed, plaintiffs' and defendant's interpretation of the lease provisions in question are completely at odds.
"The Court therefore has allowed both parties to present evidence regarding these intentions vis a vis the lease agreement. Working well into the evening hours for two days, the Court received lengthy testimony from both plaintiffs and defendant in support of their respective positions.
"The testimony of the witnesses presented was clear and convincing:
"Prior to the signing of the lease, all parties were aware that improvements in the form of generalized office space would be needed. These improvements were to cost approximately $66,000 and were evidenced by original drawings executed by a Mr. Alphonso. Plaintiffs agreed to pay for the improvements as delineated in the Alphonso drawings, and, on August 9, 1978, signed the lease of the property with defendant. Nothing has been mentioned regarding additional improvements up to this date. On August 10, 1978, the very next day, a meeting was held on the job site between Mr. Spangenberg and Mr. Merrick, plaintiffs, and Mr. Joseph Tranno, general manager of defendant's operation, Mr. Dennis Burmaster, project manager for Broadmoor Corporation, and a Mr. Crocker and Mr. Baker, employees of defendant corporation, who apparently flew in from defendant's home base in the East or Midwest.
"At that meeting, Mr. Crocker presented new drawings on behalf of defendant which indicated the `additional improvements' which would be needed. Mr. Spangenberg, Mr. Merrick, and even Mr. Burmaster, defendant's own witness, all testified that they were shocked by the Crocker drawings. The witnesses stated that the improvements called for by the Crocker drawings were radically different from those specified and agreed upon by the parties in the Alphonso drawing. Mr. Spangenberg stated that the Crocker improvements included such special purpose items as a paint spray booth, requiring extensive electrical work to be done through the roof of the warehouse, additions of entire concrete block walls, and the installation of specialized floor drains and intensive lighting equipment. Mr. Merrick testified that he is in the business of leasing warehouse space, owning over 1,000,000 square feet of warehouse rental property in the city. He further stated that defendant's requested additions were strictly `special purpose' and was of little or no value to other potential business. Additionally, Mr. Merrick testified that in order to accommodate the Crocker improvements, over 2,200 square feet of prior-constructed office space had to be demolished.
*1273 "It has been noted above that the drawings representing these radical improvements were first presented to plaintiffs on August 10, 1978, the first day after the signing of the lease (apparently flown in by Crocker), and yet no mention was made of them by defendant to plaintiffs until August 10, 1978. Surely such complicated plans had been in preparation for weeks, and yet plaintiffs were never informed of their existence until the lease was signed.
"This method of transacting business indicates to the Court a pre-conceived attempt on the part of the defendant to take advantage of a clause in the lease. Had there been any doubt on defendant's part as to whether or not such improvements could be amortized in accordance with the lease, the logical time to inquire about such would be prior to the signing of the lease, not immediately thereafter. There is no doubt whatsoever in the mind of this Court that the defendant was in bad faithlying in wait like a lynxwaiting to spring upon an honest and unwary prey.
"In additional testimony, Mr. Spangenberg stated that no money arrangements relative to the additional improvements were made with Mr. Crocker. Obviously, plaintiffs intended defendant was to pay Broadmoor directly, and defendant intended the opposite. However, the proof of plaintiffs' intention is the testimony of Mr. Spangenberg that he advised Broadmoor Corporation to keep the accounts of the Crocker improvements and the Alphonso improvements separate, which statement was corroborated by Mr. Burmaster, defendant's own witness.
"It was not until January 29, 1979, when Mr. Spangenberg was given the bill for the additional improvements by defendant that he realized defendant intended to pay for them through the increased-rental clause of the leaseand both Mr. Spangenberg and Mr. Merrick testified that although they paid Broadmoor the full amount of the improvements, i.e., $66,000 plus $84,958.00, they did so only after Broadmoor threatened to place a lien against their property should the bill go unpaida formidable weapon obviously anticipated by defendant and one which defendant knew could not be used against it.
"As written, the lease-clause in question allows defendant to pay for the improvements at its option, 1) in cash at the time of completion; 2), as additional rent, an amount equal to 17.22% of the actual cost over a period of five years, or 86.1% of the actual cost over a period of 10 years, or 172.2% of the actual cost.
"Mr. Fallon, leasing administrator for Eaton Corporation, the parent company of which defendant Yale is a subsidiary, testified that although under the terms of the lease as invoked by defendant they would only be paying for 86.1% of the actual cost, plaintiffs would own the valuable improvements left behind at the lease's termination. However, Mr. Merrick stated that plaintiffs were willing to accept a partial payment of the improvements over the five-year amortization period, because generalized office space as contemplated by the Alphonso drawing was an asset to the property and then to plaintiffs. Alternatively, the `special purpose' improvements specified in the Crocker drawings were of little or no value to plaintiffs and, in fact, would act as a hindrance in renting the property in the future.
"The Court would like to note that the document in question was drafted by laymen who, while perhaps sophisticated businessmen, as defendant contends, are not attorneys and thus not entirely knowledgeable of the intricacies of such complex documents. While the obviously inequitable result of this clause is therefore understandable in light of the circumstances of its composition, Louisiana courts will not interpret the words of a contract literally when such an interpretation leads to unreasonable consequences or inequitable or absurd results, even where the words are fairly explicit. * * *
"Certainly to interpret the lease to mean plaintiffs will pay for approximately $85,000.00 worth of improvements which are virtually worthless to them, while defendant, who is reaping the benefit of said improvements, *1274 will re-pay plaintiffs only a small portion of that amount, considering the interest plaintiffs must pay, leads to the absurd and inequitable results referred to above. As was noted in Burt v. Hebert, 338 So.2d 717 ([La.App.] 1976), `when a dispute exists over the terms of a contract, the controversy must be resolved in light of the principle that informed and experienced parties do not ordinarily bind themselves to unreasonable obligations.' The Court considers the obligation defendant seeks to enforce completely unreasonable and was never intended by the plaintiffs.
"In conclusion, the Court has been presented with a plethora of evidence which leads to the unassailable conclusion that the `additional improvements' requested by defendant were not those contemplated by the parties and alluded to in paragraph 24 of the lease, but rather were `special purpose' improvements for which defendant was completely liable."
Spangenberg testified that the $84,000 in improvements were special purpose rather than general purpose improvements in that they are not generally of value to warehouse tenants, and he added that the distinction between the two is well-recognized by people in the business of building buildings as well as by lending institutions which issue mortgages.
Spangenberg testified that because the plaintiffs were not able to get the $84,000 of improvements financed within their mortgage, they had to go to the bank and borrow money on a short term basis to pay for them. He added that a separate $66,000 of improvements were in fact agreed to by the plaintiffs, were approved by their lender and were paid for by the plaintiffs. It was Spangenberg's opinion that the $84,000 of improvements could not be considered "additions or revisions" under the lease but were a "completely new ball of wax," and he said he was never asked by the defendant to make these improvements.
Spangenberg testified that on August 10, 1978 he met a Mr. Crocker, a representative of the defendant, at the subject warehouse. Crocker exhibited a new set of plans which required plaintiffs to tear down some of the improvements which had already been built by the contractor, Broadmoor, in accordance with the previously approved plans. Spangenberg said he told the contractor's representative to "go over to his office and see what you have to do." He said upon learning the proposed additional improvements were going to cost approximately $110,000 he called Mr. Utz, president of the defendant corporation, and told him "I hope you understand. This is an enormous amount of money that you are going to have to pay," to which Utz replied, "I know that, this is what we need to operate."
On cross-examination, Spangenberg admitted he did not participate in the actual negotiations on the lease but said that this was done between Robert Merrick and Robert Fallon. He added that although some additional improvements were contemplated under the lease, at the time of the August 10, 1978 meeting he remembered pointing out to Crocker that rather than additions they were talking about something entirely different.
On December 5, 1978, Spangenberg said he was billed by the contractor for the $66,000 worth plus the $84,000 worth of improvements. He stated that subsequently, on January 29, 1979, he met Utz at Broadmoor's office where Utz stated the defendant was electing to pay the bill he had received from the contractor at 17.22% of the lease. Spangenberg said he paid the entire amount to Broadmoor under duress because he was informed it was going to place a lien against the building unless the bill was paid.
Merrick testified that at the August 10, 1978 meeting the new plans exhibited by Crocker were a radical departure from the plans already approved by them (and which had been attached to the lease), requiring the plaintiffs to demolish 2200 square feet of office space. Merrick further stated that at that point they started setting up a separate contract with Broadmoor and said that "never before in my wildest dreams would I amortize special purpose improvements over a ten-year basis for a five-year *1275 lease, not in a general spec warehouse." Merrick also testified that he told Spangenberg to call Utz and tell him "this is for your account, we cannot pay for it"; that although they kept getting invoices from Broadmoor, Spangenberg assured him Utz was aware of the situation; that although he was aware, before the lease was signed, that some highly special purpose improvements were going into the building "we did not think we were going to pay for those"; and that the plans proposed by Crocker totally removed the previously approved plans rather than making an addition to them.
Robert Fallon, leasing administrator of the Eaton Corporation of which Yale is a subsidiary, said that from the outset of negotiations with the plaintiffs they were aware there would be special improvements because the defendant was not leasing a warehouse but a facility for the purpose of sales and service. He stated he negotiated the lease but had no authority to pay for or contract for any leasehold improvements which would have had to have specific approval in his corporation.
Fallon admitted that paying for the improvements by a formula of 17.22% per year would not pay for them over five years, but said he considered this an inducement for the lease. He said he thought this would also serve as an inducement to renew, in which case the 17.22% would amount to substantially more than what the plaintiffs were paying. He added he told Merrick he did not know what the costs of the various improvements would be, and at the time the lease was signed he did not know what the special improvements would cost. He also said he thought special improvements were to be treated the same as general improvements, and he noted the landlord owns the improvements when the defendant leaves the building. Fallon further testified there was never any contract, verbal or otherwise, between Broadmoor and Yale.
Joseph Tiano, who was acting general manager of Yale in New Orleans at the time of the contract, said that prior to the signing of the lease he told Merrick and Spangenberg what Yale would need in the way of improvements to the building to operate a lift truck dealership, and he was never told the plaintiffs would not pay for any special purpose improvements or that there was a distinction between how any additional improvements would be paid for. He said he would have had to contact headquarters for special funds to pay for this. He also said that at the August 10, 1978 meeting neither Spangenberg nor Merrick said they did not intend to pay for the new plans.
Dennis Burmaster, project estimator for Broadmoor, testified Broadmoor is a subsidiary of Boh Bros., one of the plaintiffs. He said he did not give the plaintiffs an estimate as to what it would cost to build the original plans. He explained that at the August meeting, he, Merrick and Spangenberg "were amazed" at the difference between the two sets of plans. He added because it was hot that day it was suggested that he, Tiano and Crocker go to Broadmoor's office to go over the plans, but there was no discussion as to who was going to pay for the changes. He said he was later instructed by Spangenberg to keep a breakdown of the original drawing's costs separate from the costs of the later plans.
Burmaster said as far as he was concerned he was making the improvements for the plaintiffs at the time the construction was done and thought they were going to pay the bill. He said after he sent the first bill for the total amount to the plaintiffs, he then sent a bill to Yale (at Spangenberg's request) for the $84,000. He stated approximately $38,000 of the $84,000 was for office improvements.
Furthermore, this court can find no merit in defendant's argument that plaintiffs Spangenberg, Merrick and Boh Bros. have no right of action because they are seeking to enforce the rights of a joint venture and, therefore, the case should have been dismissed by the district court judge. In support of this argument it cites Bradley v. Lemoine, 278 So.2d 148 (La.App. 1st Cir. 1973), which states that under the provisions of LSA-C.C.P. art. 688 a suit seeking *1276 recovery of an indebtedness due the partnership must be brought in the name of the partnership and not in the name of an individual member thereof. This court is also aware of Villarrubia v. Roy, 162 So.2d 86 (La.App. 4th Cir. 1964), where the court stated that while a joint venture is not identical with a partnership, it is analogous to a partnership and is controlled largely by the principles of rules applicable to partnerships. Similarly, in Dalby v. United States Fidelity & Guaranty Co., 365 So.2d 568 (La. App. 1st Cir. 1978), the court, noting Villarrubia, also said that a suit on such a claim brought individually in the name of a partner fails to disclose a right of action or interest in the plaintiff to institute the suit. In the present case, however, a review of the record reveals the suit was actually brought in the names of "Richard B. Spangenberg, Robert W. Merrick and Boh Bros. Construction Co., Inc., A Joint Venture, D/B/A Industrial Property Development Company" and the judgment in favor of plaintiffs was decreed in the same manner. Accordingly because the action was brought in the name of the joint venture, the defendant's exception of no right of action was properly overruled.
Defendant also contends the district court was in error in admitting parol evidence; however, we cannot agree. In Williams v. Bel, 339 So.2d 748 (La.1976), the court said at 750-751:
"The La.Civil Code, articles 1945, et seq., provides rules to guide us in the interpretation of agreements. Pertinently, it provides that the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences; it is the common intent of the partiesthat is, the intention of allthat is sought for [article 1945]; and when there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms [article 1950]; when the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation [article 1956]; but if the doubt or obscurity arise from the want of necessary explanation which one of the parties ought to have given, or from any other negligence or fault of his, the construction most favorable to the other party shall be adopted, whether he be obligor or obligee [article 1958]."
Since there are no limitations specifically placed by Paragraph 24 of the subject lease on changes or additions that might be requested by the tenant (resulting in increased costs), to read that clause literally would lead to the conclusion that the defendant tenant was free to request any amount of additions it chose, which the plaintiffs would also be required to implement and finance. Because the words of the contract, therefore, lead to absurd consequences, the district court judge was correct in allowing parol evidence to ascertain what was the common intention of the parties, rather than adhere to the literal sense of the terms in writing.
In Rayford v. Louisiana Sav. Ass'n, 380 So.2d 1232 (La.1980), the court also stated that ambiguous phrases in contracts are strictly construed against the party who prepared the contract. The court noted, however, it found one paragraph in the subject contract to be ambiguous because it was susceptible of "two conflicting but reasonable" interpretations. In the present case, however, rather than finding the disputed contract clause ambiguous, the district court held the $84,000 of additional improvements requested by the defendant were not those contemplated by the parties and alluded to in Paragraph 24 of the lease. Therefore, because there was no finding of ambiguity, the court was not obliged to strictly construe this paragraph against the plaintiffs who prepared the lease.
The witnesses in the present case gave completely conflicting testimony as to what the intent of the parties was regarding Paragraph 24 of the subject lease. The trial judge's conclusionsthat the defendant was in bad faith and that the $84,000 of *1277 improvements were not those contemplated by the parties and alluded to in Paragraph 24are factual findings of the district court based on a reasonable evaluation of credibility. For this reason, and because the record furnishes a reasonable factual basis for the trial court's findings, this court is bound not to disturb it due to the fact that we do not find that manifest error which would allow us to do so.
The defendant also assigns that the district court erred in awarding legal interest from January 30, 1979 rather than from the date of judicial demand. However, in Teledyne Movible Offshore v. C & K Offshore, 376 So.2d 357 (La.App.3d Cir. 1979), the court stated that unlike judgments ex delicto, interest is recoverable on debts arising ex contractu from the time they become due, unless otherwise stipulated, citing LSA-C.C. art. 1938. In the present case a review of the record reveals that on January 29, 1979 defendant informed the plaintiffs through Spangenberg that the increased costs would not be paid in cash but would be paid as additional rent. The district court judgment, therefore, was correct in determining judicial interest should be awarded from January 30, 1979, the approximate date when demand on the defendant was met by its refusal to pay in cash.
Lastly, defendant also argues on appeal the trial court judge should have been recused. Such an appeal is properly before the court, because recusation vel non is interlocutory in nature and may be reviewable on appeal of a final judgment on the merits of the case. State, Department of Highways v. McDonald, 329 So.2d 898 (La.App.2d Cir. 1976). In the case of Southern Builders, Inc. v. Carla Charcoal, Inc., 357 So.2d 638 (La.App.3d Cir. 1978), the court noted the jurisprudential rule that there must be a statutory ground for recusing a judge. The court also cited LSA-Const. Art. 1, § 22, which guarantees all courts shall be open and every person shall have an adequate remedy by due process of law and justice administered without partiality. In that case, though the appellate court felt some of the actions of the district court judge were ill-advised, it held they did not reflect such partiality as would justify his recusal, based on his testimony that he had earlier reached only tentative conclusions on the basis of evidence thus far presented and that he would decide the case on a fair and impartial basis when all the evidence was heard.
Similarly, at the recusal hearing in the present case, the trial court judge testified there was no doubt whatsoever that he could give both plaintiffs and defendant a fair and impartial trial; that he had no interest, financial or otherwise, in the case; and that the only opinions he had expressed so far about the case were based upon facts given to him at the time of the pre-trial conference. He also noted that although most of the time cases turn out the way they look at the pre-trial conference, if the evidence is different, or he is given some other law, his mind is completely open at the trial to do anything proper. In view of this, we hold the refusal of the judge who heard the evidence on the motion to recuse the trial court judge in the present case was correct because no statutory ground for recusal was presented.
For the reasons assigned, the district court decision is affirmed.
AFFIRMED.